**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.,* | ) | |
| RAUL PUENTE, | ) | |
| Petitioner, | ) | |
| v. | ) | Case No. 04 C 4877 |
| | ) | |
| NEDRA CHANDLER[1], | ) | Judge Joan B. Gottschall |
| | ) | |
| Respondent. | ) | |

**MEMORANDUM OPINION AND ORDER**

On January 2, 2008, petitioner Raul Puente ("Puente" or "petitioner") filed an amended petition for habeas relief pursuant to 28 U.S.C. § 2254. Puente is currently incarcerated after being convicted of murder based on a June 18, 1995 shooting at the El Saloon Tavern in Chicago, Illinois. For all the following reasons, the court orders an evidentiary hearing to determine whether his counsel was ineffective when he put forward a mistaken identity defense, instead of an involuntary manslaughter defense.

**I.      Procedural History**

On or about February 7, 1997, following a jury trial in the Circuit Court of Cook County, petitioner was convicted of first degree murder and sentenced to a 40-year prison term. In his direct appeal, petitioner asserted that the trial court abused its discretion in sentencing him to a term of 40 years in light of his rehabilitative potential and lack of a criminal background; he did not challenge any aspect of his conviction. On September 8, 1998, the state appellate court affirmed.

---

[1] Nedra Chandler has replaced Jerry Sternes as Warden of the Dixon Correctional Center. Accordingly, the court orders at that the clerk substitute Chandler as the proper respondent. *See* Rule 2(a) of the Rules Governing § 2254 cases in the United States District Courts.

Petitioner then filed a petition for leave to appeal ("PLA") in the state supreme court raising the following four claims: (1) the trial court abused its discretion in sentencing him when it failed to consider his rehabilitative potential; (2) trial counsel was ineffective for failing to object to the prosecution's improper remarks; (3) the State's witnesses committed perjury; and (4) the police report contained multiple errors. The PLA was denied on October 6, 1999. Petitioner did not file a petition for a writ of certiorari in the United States Supreme Court.

On February 8, 2000, petitioner filed a postconviction petition pursuant to 725 ILCS 5/122-1, *et seq.*, in the Circuit Court of Cook County alleging that: (1) trial counsel was ineffective for failing to: (a) properly investigate his case when further investigation would have led to an offer by the State for a lessor charge in exchange for a guilty plea; (b) move to suppress statements; (c) present evidence that petitioner was drinking alcohol and using cocaine at the time of the incident; (d) call certain witnesses; (e) insist that the pathologist testify; (f) properly conduct plea negotiations; (g) present a "proper" theory of defense; (h) allow petitioner to testify; and (i) question jurors on possible bias; (2) the trial judge gave improper jury instructions when he failed to instruct the jury on involuntary manslaughter; (3) the State lied about a plea offer and "misconstrued" certain post-arrest inculpatory statements made by petitioner; (4) the State improperly put forward prejudicial testimony that the police got his picture from their files of pictures of arrested individuals and that he had a "rap sheet"; (5) the trial court erred in failing to declare a mistrial; (6) the police improperly used a suggestive photo array and line up; (7) the police erred by giving Puente his *Miranda* rights in English; (8) the trial court erred in failing to provide copies of the police reports to the jury; and (9) appellate counsel was ineffective for failing to raise the aforementioned issues on direct appeal. On May 8, 2000, the trial court dismissed the petition as patently without merit.

Petitioner's counsel on appeal, the Public Defender of Cook County, filed a motion to withdraw under *Pennsylvania v. Finley*, 481 U.S. 551 (1987). Petitioner responded, raising the issues from his postconviction petition. On August 30, 2001, the state appellate court granted the *Finley* motion and affirmed. Petitioner filed a PLA raising four new claims, arguing that the state appellate court: (1) wrongly granted the *Finley* motion because he had raised issues of merit; (2) violated petitioner's due process rights when it affirmed, although the postconviction court exceeded the maximum time allowed for an initial examination of the petition; (3) erred in affirming the dismissal of the postconviction petition; and (4) violated Illinois Supreme Court Rule 23 (regarding the publication of decisions). On December 5, 2001, the state supreme court denied the petition, but vacated the appellate court's summary dismissal under *People v. Edwards*, 757 N.E.2d 442 (Ill. 2001) (holding that unless circuit court dismisses postconviction petition as frivolous or without merit within 90 days, petitioner advances to second stage and State is allowed to file a response). The Illinois Supreme Court directed the appellate court to consider Puente's appeal.

On remand, Puente argued that trial counsel was ineffective for failing to: (1) move to suppress unduly suggestive identification testimony; (2) object to an impermissible jury instruction; (3) pursue the viable defense of involuntary manslaughter; (4) investigate the case properly; (5) understand the law; and (6) allow him to testify at trial. Puente also claimed that counsel improperly stipulated to the testimony of a pathologist, and that appellate counsel was ineffective for failing to raise meritorious issues on direct appeal. On May 1, 2003, the state appellate court affirmed. Puente filed a PLA raising the same issues he raised in the state appellate court following the remand. On October 7, 2003, the state supreme court denied the PLA.

On November 27, 2007, petitioner filed the instant amended petition for writ of habeas

corpus, raising three claims: (1) trial counsel was ineffective for failing to: (a) move to suppress suggestive identification evidence; (b) challenge potentially biased witnesses; (c) investigate; (d) pursue a sound defense strategy; (e) allow petitioner to testify; and (f) object to an impermissible jury instruction on witness identification testimony; (2) the trial court erred in: (a) failing to declare a mistrial based on prosecutorial misconduct; (b) denying his motion for an involuntary manslaughter instruction; (c) imposing an excessive sentence; and (d) exceeding the 90 day examination period in 725 ILCS 5/122-2.1 for consideration of his postconviction petition; and (3) appellate counsel was ineffective for failing to raise: (a) trial counsel's ineffectiveness; and (b) the errors of the trial court.

## II.     Factual Background

On appeal from the denial of Puente's state postconviction petition, the state appellate court summarized the facts, in one sentence, as follows:

> The record shows on June 18, 1995, petitioner got into an argument with Rodriguez [the victim], exited the tavern, obtained a gun, returned to the tavern several hours later and fatally shot Rodriguez.

*People v. Puente*, No. 1-00-2333, at 10 (Ill. App. Ct. May 1, 2003).

## III.    Analysis

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a habeas petitioner is not entitled to a writ of habeas corpus unless the challenged state court decision is either "contrary to" or "an unreasonable application of" clearly established federal law as determined by the United States Supreme Court, or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1), (2); *see also Williams v. Taylor*, 529 U.S. 362, 367 (2000).  A state court's

decision is "contrary to" clearly established Supreme Court law "if the state court arrives at a conclusion opposite to that reached by the Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours." *Williams*, 529 U.S. at 405. To demonstrate an "unreasonable application" of clearly established federal law, a habeas petitioner must establish that the state court unreasonably applied the controlling legal rule to the facts of the case. *Id.* at 407. The state court's application of Supreme Court precedent must be more than incorrect or erroneous. Rather, it must be "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Hardaway v. Young*, 302 F.3d 757, 762 (7th Cir. 2002) (state court decision must lie "well outside the boundaries of permissible differences of opinion").

**A.    Ineffective Assistance of Counsel**

Petitioner claims that the Illinois Appellate Court's decision violated 28 U.S.C. § 2254(d)(1) in that the court unreasonably applied *Strickland v. Washington* to the facts of this case. In addition, petitioner also argues that the Illinois Appellate Court violated 28 U.S.C. § 2254(d)(2) when it made two significant factual errors. Surprisingly, respondent fails to make any argument on this issue, or even acknowledge Puente's allegations of factual errors made by the state appellate court. The court will first address the factual claim, as the two key facts at issue formed the basis for the appellate court's conclusion on the *Strickland* claim.

Normally, in reviewing the facts surrounding a petitioner's trial and sentence, this court looks to the last state court to issue findings of fact. Those findings of fact are presumed to be correct on federal habeas review absent "clear and convincing" evidence to the contrary. *See Williams v. Bartow*, 481 F.3d 492, 498 (7th Cir. 2007) (citing 28 U.S.C. § 2254(e)(1)). Here,

petitioner argues that such deference is not appropriate in light of the fact that the state appellate court erred in describing two key facts. "A petitioner's challenge to a state court decision based on a factual determination under § 2254(d)(2) will not succeed unless the state court committed an 'unreasonable error,' and § 2254(e)(1) provides the mechanism for proving unreasonableness." *Ben-Yisrayl v. Buss*, 540 F.3d 542, 549 (7th Cir. 2008) (citing *Ward v. Sternes*, 334 F.3d 696, 703-04 (7th Cir. 2003)). If a petitioner can show that the state appellate court determined an underlying factual issue "against the clear and convincing weight of the evidence," the petitioner has "'gone a long way towards proving that it committed unreasonable error.'" *Id.* (quoting *Ward*, 334 F.3d at 704). "A state court decision that rests upon a determination of fact that lies against the clear weight of the evidence is, by definition, a decision 'so inadequately supported by the record' as to be arbitrary and therefore objectively unreasonable." *Ward*, 334 F.3d at 704 (quoting *Hall v. Washington*, 106 F.3d 742, 749 (7th Cir. 1997)).

Upon careful review of the state court record, the court concludes that the Illinois Appellate Court determined two facts against the clear and convincing weight of the evidence when it concluded that petitioner had "an argument with Rodriguez" (the victim) and "returned to the tavern several hours later" with a gun. No witness testified that petitioner had an argument with the victim. Instead, Jose Montejno, the bartender at the El Saloon on the night of the shooting, testified that he saw *no conversation* between Puente and the victim. Montejno also testified that he witnessed a heated exchange between Puente and another man, the victim's cousin. Likewise, the testimony at trial contradicts the finding made by the Illinois Appellate Court that Puente left the bar, retrieved a gun and returned to the bar a few hours later. The trial testimony actually showed that after he left the bar, Puente retrieved a gun and returned to the bar a few *minutes* later.

Montejno testified that petitioner was outside for a few minutes before petitioner came back inside the bar with a gun. In addition, the testimony of eyewitness Juan Morales also supports the fact that petitioner, after leaving the bar, reentered the bar shortly thereafter with a gun in his hand.

Because both of these facts are relied upon by the Illinois Appellate Court in its *Strickland* analysis, the court's opinion contains an "unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d)(2); *Ben-Yisrayl*, 540 F.3d at 550 (concluding that a violation of § 2254(d)(2) occurred where state supreme court relied on erroneous fact in its *Strickland* analysis). The Seventh Circuit has made clear that a violation of § 2254(d)(2) occurs even when the state court's "decision only partially rested on [the erroneous] fact . . . [E]ven a partial reliance on an erroneous fact finding can support a finding of unreasonableness." *Ben-Yisrayl*, 540 F.3d at 550.

Having concluded that the Illinois Appellate Court's findings were unreasonable, the court recognizes that petitioner must still establish that he is entitled to habeas relief, although the court need not defer to the state court's conclusions with respect to this claim. *Id.*; *Pole v. Randolph*, 570 F.3d 922, 948 (7th Cir. 2009) (stating that where the state court erroneously made certain factual findings, the federal habeas court should review the claim without the normal deference to the state court); *Aleman v. Sternes*, 320 F.3d 687, 690 (7th Cir. 2003) ("[E]ven when the AEDPA standard does not apply – either because the state court's opinion was unreasonable or because the state judiciary did not address the constitutional claim – [a] prisoner still must establish an entitlement to the relief he seeks."). "In this situation, § 2254(a) sets the standard: the court issues 'a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the constitution or laws or treaties of the United States."

*Ben-Yisrayl*, 540 F.3d at 550.

The court turns then to what it considers to be Puente's most compelling argument: that petitioner's trial counsel provided ineffective assistance of counsel when he decided to pursue a strategy of mistaken identity, instead of pursuing a strategy of involuntary manslaughter.[2] In order to analyze this claim, the court must review the evidence presented at the suppression hearing and the trial to determine the reasonableness of counsel's strategy.

### 1.      Evidence at Trial

The evidence at trial showed that at approximately 12:30 a.m. on Sunday, June 18, 1995, a shooting occurred at the El Saloon Tavern, at 2629 South Lawndale, Chicago, Illinois. Police arrived shortly thereafter. Detective Alfred Perez was assigned to investigate the shooting. At the time the police arrived at the scene, the victim, Rojelio Rodriguez, was still alive. He was taken to Mt. Sinai Hospital, where he died about ten days later. Police recovered a single bullet from the bar area in the front of the tavern. It was on the floor, under a sink, behind the bar. Two empty shell casings were found in the front of the tavern, as well. No weapon was recovered. The offender was gone when the police arrived.

### a.      Bartender Jose Montejno

On the evening in question, Jose Montejno was working as a bartender at the El Saloon at 2629 South Lawndale in Chicago. Montejno testified that he recognized the shooter as "Raul," and

---

[2] Respondent argues that Puente procedurally defaulted his claim that his counsel should have put on a defense of second-degree murder because, before the state courts, he only faulted his counsel for failing to put forward an involuntary manslaughter defense. The court agrees and limits its discussion to the possibility of an involuntary manslaughter defense. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 844-45 (1999) (petitioner must raise claim before each level of the state courts in order to avoid procedural default).

that he had known Raul for "about 3 years." Trans. at E22. He further testified that he had seen Raul "about 3 or 4 times a year" during those years. *Id*. Raul and a friend came into the bar at 7:00 p.m. or 8:00 p.m that night, and Raul was drinking beer. Montejno also knew the victim, Rojelio Rodriguez, for about six months prior to the shooting. Montejno stated that Raul and the victim were sitting towards the front of the bar, but that there was no conversation between them. Montejno went on to describe that another individual, the victim's cousin, was sitting at the bar and got into an argument with Raul. Montejno was in the rear of the bar, so he could not hear the words exchanged between the two men, but he could see them talking to each other. At some point later, Montejno saw Raul leave the bar and he followed Raul outside about three minutes later, to make sure "everything [was] okay." Trans. at E26. When he got outside the bar, Montejno saw Raul emerge from a double-parked car with a gun in his hand. Raul's friend, who had been drinking with him at the bar, was in the driver's seat of the car. Montejno tried to talk to Raul and calm him down. At that point, Raul put the gun to Montejno's head and told Montejno to stay away from him. Raul then ran inside the bar. Montejno heard two or three shots, and, after a "matter of seconds," Trans. at E30, Raul came back out of the bar. Raul again pointed the gun at Montejno's head. Montejno heard Raul say "Let's go. Let's go. I killed somebody" as he jumped into the passenger's seat of the waiting car. Trans. at E31. Montejno then went back into the bar, where he saw the victim on the floor in front of the jukebox. After the police arrived, Montejno indicated to them that he knew Raul's first name, and that the police should contact Manuel Avila or David Carosa, both of whom were friends with Raul. About a month after the shooting, Montejno, after being shown a photo array consisting of five color photographs, identified petitioner as the man with the gun at the El Saloon Tavern. Two or three months later, Montejno identified Puente as the man with the gun from

a line-up. Montejno testified that Raul in June of 1995 was "more bald and more fat" than the Raul in the photograph. Trans. at E46. He also stated that Raul was wearing a black hat and a black shirt on the night of the shooting. He stated that he told Detective Perez that he thought he remembered that Raul's last name was Mercado. Montejno could not make any identification of petitioner in court.

On cross examination, Montejno testified that there were approximately 30 people in the bar at the time of the shooting. He stated that in the photo array, one individual was wearing a blue hat, one a yellow hat, one a light blue hat, and petitioner was wearing a black hat in his photo. Further, Montejno testified that Raul did not have any facial hair. Raul was the only individual in the photo array who did not have facial hair.

### b.       Cuauhemore Murillo

Cuauhemore Murillo, at the time of the shooting, was a twenty-one year old college student who lived in an apartment on the second floor of 2631 South Lawndale, which was next to the El Saloon bar. At the time of the shooting, Murillo was sitting on the sofa in his living room watching television. The windows in his living room looked out onto Lawndale. At around 12:30 a.m. on June 18, 1995, Murillo heard arguing outside the window. As he looked outside the window in the direction of the El Saloon bar, Murillo saw a double-parked car and he saw two men arguing. One of the men, who was holding a gun, was a short and stocky hispanic male (around 5'6") and was wearing a dark cap and a dark shirt. The man with the gun was pointing the gun at the head of the other individual out on the street. The two men on the street were only two or three feet apart. Murillo heard the driver of the double-parked car yelling something. The man with the gun went out of Murillo's view (toward the bar) and Murillo heard two or three gunshots. Not long after the

shots, the man with the gun came back into Murillo's view and ran into the parked car. The car then

sped off. A few hours later, Murillo gave a description of the man with the gun to the police.

Murillo had never seen the individual before that evening. Murillo told the police that he thought

the car's license plate number was "something like MGP 75." Trans. at E107. In August 1995,

Murillo viewed a four-person line-up. Murillo informed the police that he could narrow down his

selection to two people in the array, one of whom was petitioner.

### c.    Juan Morales

Juan Morales, who was present at the El Saloon bar on the night of the shooting, was a sixty-

seven year old master bread maker. After finishing work around midnight and picking up a piece

of pizza, Morales went to the El Saloon bar for a beer. He arrived at approximately 12:30 a.m.

After he got a beer, he stood in the back of the bar by the pool table. Morales testified that he

observed an individual throw stools at "a man who ran away." Trans. at E123. In court, Morales

identified Puente as the man who had the stools thrown at him. Morales testified that he saw Puente

run out of the bar and then reappear with something in his hand. He saw that this object started to

spark and pop and then he realized it was a gun. Morales testified that he saw the man with the gun

point the gun at a bartender's head while the two were outside. When asked where the gun was

pointed before the man shot the gun, Morales replied, "I didn't see well because it was in front and

you couldn't see well in front." *Id*. at E124. However, Morales went on to testify that the man had

the gun "in front of him," which Morales reenacted with "his arm bent at the 90-degree angle with

the gun straight in front of him." *Id*. at 125. Morales stated that he "heard the first shot, and I went

down to the ground, and I didn't see anything else." *Id*. After three or four shots, the shooter left

the bar. Morales testified that the victim was in the back of the bar, dancing near the pool table,

when he was shot.  On August 10, 1995, Morales identified petitioner from a four-person line-up as the man with the gun: "I saw him.  The shadow that night that I saw, it was him."  Trans. at E129.

On cross-examination, Morales testified that he was not wearing his glasses on June 18, 1995 because "I see fair though.  I don't wear them."  *Id*. at E140.  He also stated that he has "very small" cataracts and "they don't operate yet."  *Id*.  He stated that the man with the gun had on a black cap.  He also testified that there were about 15 people between him and the shooter.

### d.　　　Detective Alfred Perez

Detective Alfred Perez testified that he was assigned the follow-up investigation of the shooting at the El Saloon tavern.  Jose Montejno, El Saloon's bartender, told Perez that the first name of the shooter was Raul.  Montejno told him to contact Manuel Avila, who might have information on Raul's whereabouts.  Perez spoke with Avila, who told the detective that he knew a Raul who was a welder who lived in Cicero, although he did not know the exact address.  Avila also told Perez that he thought that Raul may have belonged to a church in Cicero.

Perez also spoke with David Cerigosa, who lived on the second floor above the El Saloon bar.  Cerigosa informed Perez that he knew a Raul with whom he used to work and that Raul moved to Cicero five years prior.  Cerigosa thought Raul's last name might be Moreno, but he was not sure.  Cerigosa informed Perez that there had been a baptism at Blessed Agnes Church.  Cerigosa had a photograph of that baptism and the date of the baptism was listed on the back of the photo.  He said Raul had one of his children baptized on the date listed on the photo.  At this time, Perez was still looking for a Raul Moreno.  After consulting with the church's pastor and the baptismal records, Perez discovered that a couple, Maria Munoz and Raul Puente, had a child baptized on the day in

question. Perez ran the name, Raul Puente, through police computer files which listed an address in Cicero. Perez also discovered that Puente had a car registered in his name with the license plate number of WGP 759.

After gathering this information, Perez showed Montejno a photo array. Montejno identified Raul Puente as being the man in the bar with the gun. Perez's investigation revealed that Raul Puente also went by the name of Raul Mercado. Once he had the photo identification, Perez went to Puente's home in Cicero. After determining that he was not at home, Perez went to Puente's place of employment and took Puente into custody.

Perez took Puente to an interview room on the second floor at the police station at Harrison and Kedzie and interviewed him. Perez and Puente were the only ones present for the interview, and the interview was conducted entirely in English. First, Perez advised Puente of his *Miranda* rights, and Puente responded that he understood those rights. Perez testified that Puente made the following statement to him:

> [Puente] said he was in the bar, and he said he had fired a gun into the bar. He said that it was probably a .38 that he had, but that the gun was loaded with blank ammunition. And then he said it was a .45-caliber pistol that he had, semi-automatic, and he insisted again the weapon only had blank ammunition. I told him that a person had been shot in the bar at that time, and they had recovered a bullet from the bar, and he still insisted that the weapon that he had fired [had] blank ammunition.

*Id*. at E175. Perez stated that he had recovered a fired bullet on the floor under the sink behind the bar, where it had penetrated the bar itself. Perez testified that about ten or fifteen minutes after Puente made his first statement, he made a second one as follows:

> [Puente] began by saying he had been at a bar at 29th and Pulaski. While in that bar he met up with another man, and he struck up a conversation with this man, a male white hispanic. And he said in their conversation this gentleman offered to sell him a pistol. He said he wasn't interested, but he thought maybe he could find someone that would be interested in firing the pistol. He suggested together they go to the bar

13

a [sic] El Saloon at 2629 South Lawndale, a place [Puente] was familiar with, and perhaps they can sell the gun there.

…

He said once they got in the bar, he had been in there about an hour or so, and while they were there, he saw a taller older man looking at him. He said this man was giving him the evil eye. … He said this man approached him, cursing at him calling him an asshole, referring to him as a motherfucker, and he started to push on the defendant. … The defendant said he tried to calm things down. He didn't want to get into a fight with this man. … Mr. Puente said he then left the bar. … He said he was very angry. He said he was angry, and he went to the car and asked for the gun that his companion had. … He said he went back into the bar, and he stood in the doorway, and he stood into the doorway and he fired a shot into the ceiling. … The people began throwing chairs and bottles at him. He said he then fired another shot, and at this point he said he was pushing back out of the bar, and he was struggling with a man on the sidewalk in front of the bar. He believed this man to be the bartender. … As he struggled, he said he was able to brake [sic] free, and he started to step away. He said the bartender grabbed at him. He said he then pointed the gun at the bartender and told him to back off. … He said he walked up to his car and drove away with this other man he had come to the bar with. … He said he drove back to 29th and Pulaski where his car was parked. He then got into his own personal car. He drove to the area of 3200 south on Keeler where he said he threw the gun into some bushes in a railroad yard, and he then went home.

*Id.* at E177-E180.

After Puente made these statements, Perez arranged for Montejno, Murillo, and Morales to view a line-up. Montejno and Morales identified Puente as the man with the gun. Murillo viewed the line-up and was only able to narrow down his selection to two individuals, one of whom was Puente. After the line-ups, Perez called the State's Attorney's Office and State's Attorney Mike Cawley arrived at the police station at approximately 2:00 p.m. Cawley advised Puente of his *Miranda* rights and proceeded to have a conversation with Puente, in Perez's presence. Puente then proceeded to tell Cawley the same narrative he earlier told Perez.

### e.     Medical Examiner

The medical examiner's report, which was introduced into evidence at trial on the stipulation

of the parties, stated that the fatal bullet entered the victim's left chest below his armpit and exited on his lower right side. According to the report, the medical examiner concluded that the bullet traveled in a downward direction through the victim's body.

### f. License Plate

The parties stipulated that Puente's vehicle's license plate number in 1995 was WGP 759.

### g. Maria Puente

Maria Puente testified that she had known Raul Puente for nineteen years, lived in Cicero, Illinois, and had four children with him. She testified that Spanish is the language they used at home, and that they watch Spanish-language television and read magazines in Spanish.

### h. Michael Cawley

Cawley testified that he was an Assistant State's Attorney in the Cook County State's Attorneys Office. He was assigned to the Felony Review Unit and received an assignment on August 5, 1995 to speak with Detective Perez with regard to a murder investigation involving Raul Puente. Cawley confirmed that he had a conversation, in English, with Puente at approximately 2:10 p.m.

### 2. Evidence at Hearing Regarding Motion to Suppress Puente's Statements

### a. Puente

On January 25, 1996, the state trial judge conducted a hearing on Puente's motion to suppress his statements based on a violation of *Miranda*. Puente testified regarding the events of August 5, 1995, when police officers arrived at his place of employment and arrested him. According to Puente, three plainclothes police officers told him they wanted to talk to him, and asked him to sit with them in their car. The officers denied that they were going to take Puente to

the police station.  One of the officers placed his hands on Puente's shoulders and directed him to the car.  They did not tell him that he was under arrest or show him an arrest warrant.  Despite the fact that Puente told the officers he only understood a little bit of English (and one of the officers said she spoke Spanish), the officers spoke to Puente in English.  When Puente arrived at the station, he told the officers that he needed to call his wife.  Puente testified that an officer "put me in the investigating room [and] he told me later, later, and that's all he told me later."  Trans. at B10-B11.  Puente stated that he wanted to call his wife to see if she could get him an attorney.  Puente stated that it was approximately 8:00 p.m. when he met with the Assistant State's Attorney, who first read him his *Miranda* rights.  Puente also testified that he did not know that he killed someone until he met with the Assistant State's Attorney.  Puente said that he was only allowed access to a telephone after he had been questioned by the police officers and the Assistant State's Attorney.

On cross-examination, Puente testified that he never asked the police officers for an attorney because they told him they were going to provide one for him.  He admitted that he was the shooter when he stated, "... the only reason I went back to the bar is to use the bathroom, but these same individuals started insulting me again . …. [Then] they started throwing bottles at me and I fell down to the floor, and that's when the gun went off . … When the police asked me how many shots I'd fired, I told them that I only heard two shots . …. I never shot nobody . …. Directly to a person, no."  Trans. at B31-32.

### b.    Detective Perez

Detective Perez testified that he advised Puente of his *Miranda* rights.  According to Perez, Puente responded that he understood his rights and waived them.  Puente then proceeded to make two statements to Perez regarding the shooting at the El Saloon bar.  He then testified that Assistant

State's Attorney Mike Cawley arrived at the station at approximately 2:00 p.m. and then immediately read Puente his *Miranda* rights, which Puente again waived. Puente then gave Cawley a statement, similar to the one he earlier gave to Perez, concerning the shooting. Perez also testified that Puente never indicated that he wanted to make a phone call or have an attorney present during questioning.

## 2. Analysis under 28 U.S.C. § 2254(a)

To establish ineffective assistance of counsel, a petitioner must demonstrate: (1) that his attorney's performance was deficient; and (2) that such representation prejudiced his case. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The first prong is satisfied by showing that counsel's performance fell below the "objective standard of reasonableness" guaranteed under the Sixth Amendment. *Barker v. United States*, 7 F.3d 629, 633 (7th Cir. 1993) (quoting *Strickland*, 466 U.S. at 688). To satisfy the *Strickland* prejudice element, a petitioner must demonstrate that it is reasonably likely that, but for his counsel's errors, the decision reached would have been different. *Strickland*, 466 U.S. at 696.

A reviewing court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). The Supreme Court in *Strickland* emphasized that "[j]udicial scrutiny of counsel's performance must be highly deferential," and that "[a] fair assessment of attorney performance requires that every effort be made to … reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id*. However, "[a]n attorney's decisions are not

immune from examination simply because they are deemed tactical." *U.S. ex rel Hampton v. Leibach*, 347 F.3d 219, 249 (7th Cir. 2003). "[T]he mere incantation of the term 'strategy' does not insulate an attorney's actions from review." *Harding v. Sternes*, No. 00 C 7515, 2003 WL 21321340, *7 (N.D. Ill. June 9, 2003) (citing *Hardwick v. Crosby*, 320 F.3d 1127, 1185-86 (11th Cir. 2003) and *Hooper v. Mullin*, 314 F.3d 1162, 1169-70 (10th Cir. 2002)). "The relevant question is not whether counsel's choices were strategic, but whether they were reasonable." *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000).

Puente argues that his trial counsel was ineffective for pursuing a mistaken identity defense instead of seeking an involuntary manslaughter conviction. He argues, "Several sound, affirmative defenses [including involuntary manslaughter and second degree murder] existed that Mr. Puente's counsel should have pursued instead of taking the 'enormous risk' of rolling the dice on a first degree murder charge based on a defense of mistaken identity, <u>particularly</u> in the face of Mr. Puente's self-incriminating statement that he discharged a handgun at the El Saloon tavern and the State's corroborating evidence." Brief in Support of Am. Pet. at 75 (emphasis in original). Puente points out that a theory of involuntary manslaughter was consistent with the evidence presented at trial, while mistaken identity was not, especially because it left petitioner open to a much stiffer penalty (20 to 60 years for first degree murder) than that applicable to involuntary manslaughter (2 to 5 years). Puente strenuously argues that the State's evidence of Puente's actual intent was thin and the misidentification defense never had a realistic chance to succeed.

Respondent counters that counsel's decision to pursue a mistaken identity defense in lieu of any and all other defenses was strategic, and therefore immune from federal habeas review. According to respondent, "trial counsel's actions were not unreasonable." Resp. at 47. Respondent

fails to acknowledge Puente's challenge to the facts set out by the state appellate court, and argues that the following facts (which the court has already rejected as unsupported by the evidence at trial) support a finding of premeditation and intent: (1) Puente argued with the victim; and (2) Puente left the bar after the argument and returned a few hours later with a gun.  Respondent also points out that Puente pointed the gun at the bartender's head and allegedly said "Let's go, let's go, I killed somebody" upon exiting the tavern.  According to respondent, "it is clear that counsel's decision to forego an involuntary manslaughter defense for one of misidentification was reasonable, especially with ample evidence that certain witnesses were unsure of the precise identity of the shooter."  Resp. at 51.  Respondent does not address the fact that Puente admitted to being the shooter.

With this claim in mind, the court must now determine whether or not an evidentiary hearing is warranted.  The availability of an evidentiary hearing on habeas review is addressed in 28 U.S.C. § 2254(e)(2), which provides that no such hearing may be held "[i]f the applicant has failed to develop the factual basis of a claim in State court proceedings," subject to several narrow exceptions provided in § 2254(e)(2)(A) and (B).  In *Williams v. Taylor*, 529 U.S. 420, 432 (2000), the Supreme Court held that "[u]nder the opening clause of § 2254(e)(2), a failure to develop the factual basis of a claim is not established unless there is a lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel."  Further, diligence under § 2254(e)(2) "depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court; it does not depend . . . upon whether those efforts could have been successful."  *Id*. at 435.  A petitioner, who was diligent in seeking a state evidentiary hearing, but whose requests were denied, has not failed to develop the facts underlying his claim, and "will be excused from showing compliance with the balance of [§ 2254(e)(2)'s] requirements."

*Id.* at 437.

Here, Puente is not constrained by § 2254(e)(2) because he did, in fact, attempt to develop the factual basis of his claim in state court. To his state postconviction petition Puente attached his own affidavit which detailed his version of the events of June 17-18, 1995. In addition, Puente requested that the state court hold an evidentiary hearing to develop the facts supporting his claims. The fact that the state court denied that request does not negate Puente's diligence in attempting to develop the factual record. As a result, his request for an evidentiary hearing is determined under pre-AEDPA standards. *Davis v. Lambert*, 388 F.3d 1052, 1059 (7th Cir. 2004). Under pre-AEDPA standards, an evidentiary hearing is required if (1) the petitioner alleges facts which, if proved, would entitle him to relief, and (2) the state courts never considered the claim in a full and fair hearing. *Id.* at 1061. Because Puente's claim was never considered by the state courts in a hearing and because the court concludes that he has alleged facts which would entitle him to relief, the court orders an evidentiary hearing on Puente's claim that his counsel was ineffective for putting forward a mistaken identity defense instead of an involuntary manslaughter defense. *See generally United States ex rel. Hampton v. Leibach*, 347 F.3d 219, 244 (7th Cir. 2003) (supporting district court's grant of an evidentiary hearing where petitioner made out *prima facie* case of ineffectiveness and district court needed hearing to investigate trial counsel's efforts).

ENTER:

_____/s/_____

JOAN B. GOTTSCHALL
United States District Judge

DATED:   August 6, 2010