# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| RAUL PUENTE, | ) | |
| Petitioner, | ) | Case No. 04 C 4877 |
| | ) | |
| v. | ) | Judge Joan B. Gottschall |
| | ) | |
| NEDRA CHANDLER, Warden, Dixon | ) | |
| Correctional Center, | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION AND ORDER

On June 18, 1995, Rogelio Rodriguez was fatally shot in the now-shuttered El Saloon Tavern on South Lawndale Avenue in Chicago. Following a jury trial, petitioner Raul Puente was found guilty of first-degree murder in connection with Rodriguez's death and was sentenced to a forty-year term of imprisonment. Puente filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. After appointing counsel, the court found that Puente was entitled to an evidentiary hearing to develop his claim that his trial counsel's choice of a mistaken identity defense instead of an involuntary manslaughter defense was constitutionally ineffective. Before the hearing could take place, the Supreme Court issued *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011), which addressed evidentiary hearings in § 2254 proceedings.

Based on *Cullen*, the court concluded that no evidentiary hearing was necessary as Puente was entitled to habeas relief based on the record before the state court. After the Seventh Circuit's decision in *Mosley v. Atchison*, 689 F.3d 838 (7th Cir. 2012), interpreting *Cullen*, it then revisited this holding and held a four-day evidentiary hearing. For the following reasons, the court now rejects Puente's ineffective assistance of counsel claim and thus denies his petition for a writ of habeas corpus.

# I. BACKGROUND

## A.      State Court Proceedings

### 1.      Puente's Statement

On August 5, 1995, Puente was taken into custody.  Police spoke with Puente.  They assert that they advised Puente of his *Miranda* rights, and that Puente indicated that he understood his rights and wished to speak with the police.  The statement, as reported by the police, provides, in pertinent part, that:

PUENTE, Raul:

related that he had fired a handgun into the bar but that the weapon was loaded with blank rounds.  At first, Puente described the weapon as being a .38 cal. revolver[,] then later said that the handgun was a .45 caliber automatic pistol.  Puente continued to state that the weapon only had blank rounds.  When informed that a person had been shot and that the R/D's [responding detectives] had recovered a fired bullet, Puente insisted that the weapon did not have live ammunition.

In a subsequent interview, when asked about his activities on the night of the shooting, Puente related the following information in essence and not verbatim.

PUENTE, Raul:

related that he had gone to a bar at 29th. [sic] and Pulaski where he met a M/WH [white male] and started up a conversation.  During this conversation, the M/WH asked Puente if he wanted to buy a gun or if he knew someone interested in buying a gun.  Puente stated that he was not interested in the gun but that he may be able to find a buyer.  They then left the bar together at 29th. [sic] and Pulaski and continued on to the El Saloon at 2629 S. Lawndale, a bar Puente was familiar with.  Puente added that they drove to the El Saloon in the M/WH's auto.

Puente and the M/WH were in the El Saloon for about an hour when Puente noticed another patron in the bar who appeared to be with a group of other people.  This person, a M/WH taller and older than Puente, began staring at Puente giving Puente the "evil eye".  After looking at Puente for a period of time, the subject approached Puente and started calling Puente an "asshole" and

"mother fucker." This subject tried to start a fight with Puente and Puente attempted to calm down this subject. Puente, wanting to avoid a fight with the subject, left the bar. When he got outside, Puente said he was very angry when he asked for the gun which his companion had and then walked back into the bar. As Puente stood in the doorway of the bar, he fired a shot into the ceiling. After the first shot, some of the patrons in the bar started throwing bottles and chairs at Puente. Puente then fired another shot into the bar and then was forced out of the bar and on to [sic] the sidewalk. As Puente was struggling on the sidewalk with a man he thought was the bartender, Puente fired another shot. As the bartender attempted to grab him, Puente pointed the gun at the bartender and ordered him to stop and back off. Puente then walked to his companion's car which was double parked in front of the El Saloon. Puente was then driven back to the area of 3300 S. Keeler, near Piotrowki Park, where he threw the pistol into some weeds near a railroad yard. Puente then went home.

*See* Original Habeas Pet. Ex. E (statement).

### 2. Puente's Motion to Suppress

Prior to trial, Puente sought to suppress his statement. At the hearing for the motion to suppress, Puente categorically denied that he made any incriminating statements to the police. He testified that three officers came to his place of employment on August 6, 1995.[1] The officers spoke in English, even though Puente asked them to speak in Spanish because he could understand only a little English. The officers took Puente to the station. Puente told them he wanted to call his wife "to get someone to help me," but the officer put him in a room and said, "later, later." State Tr. at 10.

Puente further testified that upon his arrival at the station, no one told him that he had the right to remain silent, that anything he said could be used against him in court, that he had a right

---

[1] On direct examination during the motion to suppress, Puente denied that the conversation took place on August 5, 1995. On cross-examination, however, he conceded that the correct date was August 6, 1995.

to an attorney, and that one would be appointed if he could not afford to retain one.[2]  The officers

had Puente participate in a line up.  Then, they took him to an interrogation room and told him

he had shot someone, but did not say that the victim had been killed.  An officer asked Puente

questions "in regards to a shooting that happened in a bar called El Saloon."  State Tr. at 16.

Puente "started to tell him, [he did] not know if it was El Saloon or somewhere else."  *Id*.

Puente testified that as he was being questioned, he asked the officers questions about "how it

was, how it had happened."  *Id*.

Puente denied ever telling the police that he had fired a .38 caliber gun with blanks into

the bar because he was angry.  He testified that he did not know what kind of gun it was because

he had just purchased it, and that other police officers had told him it was a .45 caliber gun.  He

then denied that he had fired a .45 caliber gun and asserted that he "always had [his] gun in [his]

pocket."  *Id*. at 30.  He also denied leaving the El Saloon to retrieve a gun from his car.  Instead,

he testified that he left the bar to go to his car to walk two individuals to the car.  He later

testified that the reason he went to the car was to drop off fans he had purchased.  After arriving

at the car, Puente returned to the El Saloon for the purpose of using the restroom.

Puente denied telling police that he fired a shot into the ceiling of the El Saloon.

According to Puente, people threw bottles at him as he entered the El Saloon to use the restroom,

he fell, and the gun discharged.  In response to the question, "So you are saying that you never

told anyone . . . that you fired the gun into the saloon," Puente responded, "Directly to a person,

no."  *Id*. at 32.  Puente also told police that he heard two shots fired on the evening of the

---

[2]  However, during his deposition in this case, Puente testified that the police read him his
rights when he arrived at the station.  Puente Dep. at 62 (the prosecutor and Detective Perez both
read Puente his rights).

shooting.  Finally, Puente testified that after the police finished questioning him, an Assistant State's Attorney came into the interrogation room.  The Assistant State's Attorney read Puente his rights and advised him that the victim had died.

Detective Perez, one of the officers who had questioned Puente following his arrest, testified on behalf of the State.  Detective Perez stated that he came to Puente's place of employment to question him regarding a "shooting investigation."  Detective Perez read Puente his rights in English before questioning him.  Puente responded in English, waived his rights, and made a statement tracking the written summary he drafted for the police report memorializing Puente's statement.  Detective Perez felt Puente was able to understand English fluently.  According to Detective Perez, Puente first asked to call his wife after the Assistant State's Attorney finished questioning Puente.  State Tr. at 40-59.

The trial court stated that based on its observation of Puente during the suppression hearing, it believed he was intelligent and "was not about to be lured or tricked into any answer by cross examination that might be against his best interests."  *Id*. at 64-65.  Nevertheless, the court observed that Puente's testimony about dates, times, and other details was confused and inconsistent.  It then found that Detective Perez's testimony was consistent and credible.  Thus, it denied the motion to suppress.  Ultimately, a jury found Puente guilty of first-degree murder.

### 3.    Puente's Direct Appeal

Puente appealed.  In its order affirming the trial court on direct appeal, the Illinois Appellate Court summarized the facts in one sentence, as follows: "The record shows on June 18, 1995, [Puente] got into an argument with Rodriguez [the victim], exited the tavern, obtained a gun, returned to the tavern several hours later and fatally shot Rodriguez."  *People v. Puente*,

No. 1-00-2333, at 10 (Ill. App. Ct. May 1, 2003) (unpublished order) (Dkt. 159-1). Puente filed an unsuccessful petition for leave to appeal ("PLA") with the Illinois Supreme Court.

### 4. Puente's State Post-Conviction Proceedings

Puente then filed a state post-conviction petition pursuant to 725 Ill. Comp. Stat. § 5/122-1, *et seq*., arguing that his trial counsel's reliance on an misidentification defense was constitutionally ineffective. The trial court summarily dismissed the petition, and the Illinois Appellate Court allowed Puente's counsel to withdraw and affirmed the summary dismissal. The Illinois Supreme Court remanded and directed the Illinois Appellate Court to appoint counsel, which it did. After counsel filed a merits brief, the Illinois Appellate Court again affirmed. The Illinois Supreme Court rejected Puente's PLA from that order.

### B. Puente's § 2254 Petition

Puente filed a federal petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Among other things, he argued that a mistaken identify defense was doomed in light of his alleged incriminating statement to the police that he discharged his gun at the El Saloon on the fateful night that Rodriguez was shot and corroborating evidence presented by the State. He thus asserted that his trial counsel's decision to pursue this defense, as opposed to involuntary manslaughter (based on accident or self-defense), violated his constitutional right to effective assistance of counsel. The respondent countered that counsel's decision to pursue a mistaken identify defense was strategic and, therefore, could not support a grant of federal habeas relief.

Based on its finding that the single-sentence recitation of the facts in the Illinois Appellate Court's order in Puente's direct appeal was not supported by the record and the lack of any factual summary in the Illinois Appellate Court's post-conviction orders, this court

concluded that the state court's decision was based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(2). It thus held that an evidentiary hearing was necessary based on the materials submitted to this court supporting Puente's § 2254 petition. Before the court could hold the hearing, the Supreme Court issued its decision in *Cullen*.

The court ordered briefing from the parties regarding the effect of *Cullen*. It concluded that under *Cullen*, an evidentiary hearing was not appropriate and that Puente was entitled to § 2254 relief based on the state court record. In support, it surveyed the State's identity evidence, including Puente's admission that his gun discharged at the El Saloon on the night of the shooting, and found that given all of the evidence, trial counsel's decision to pursue a mistaken identify defense rose to the level of ineffective assistance of counsel. Based on the Seventh Circuit's subsequent decision in *Mosley* interpreting *Cullen*, however, the court sua sponte reconsidered its grant of habeas relief based on the state court record and ordered an evidentiary hearing due to the state court's summary rejection of Puente's claim of ineffective assistance counsel and the lack of a fully developed factual record relating to that claim.

## C.    Facts

The following facts are drawn from the state court record and the evidentiary hearing before this court. Although the evidentiary hearing was protracted and the parties submitted extensive, oversize post-hearing briefs (including a 77-page opening brief and a 14-page reply from Puente, following up on his initial 117-page memorandum in support of habeas relief and his 41-page reply), the facts are relatively straightforward.

1.      **Puente's Testimony at the Federal Evidentiary Hearing**

a.      **Puente's Background**

Puente was born in Mexico.  He came to Chicago in 1974, married, and purchased a home.  He was employed in construction and secured a job as a welder, and held that job until his arrest in 1995.  He was not an American citizen and was aware that a criminal conviction could lead to his deportation.

Puente had no convictions prior to his trial for Rodriguez's murder.  However, he had been arrested several times previously and had used a false name for two of those arrests.  He had also received supervision on an arrest for auto theft and had retained private counsel to contest a rape charge.

Prior to the night of the shooting, Puente generally drank four to five beers on weekends.  He also used cocaine, but was careful about his use because his employer conducted drug tests.  He was aware that cocaine was packaged in quarters of a gram and that a quarter-gram consisted of four lines of cocaine.

Puente owned an unregistered gun, bought from an unknown person at a bar "one or two years ago" for $275.  Fed. Tr. at 212, 462-63.  He testified that he purchased the gun for his family's protection after his home was burglarized but decided to sell the gun when he found his daughter playing with it.

b.      **The Shooting at the El Saloon**

On the day of the shooting – Saturday, June 17, 1995 – Puente returned home in the mid-afternoon after a full day of work.  As it was a hot summer day, he changed into a sleeveless

tank, shorts, and flip-flop style sandals. After playing with his daughters, he decided to work on his wife's car. At approximately 6:30 p.m. he went to the garage to remove his car so he could park his wife's car there for repairs.

At this point, Luciano Koss, Puente's neighbor, entered Puente's garage holding beers. Puente drank two beers. Koss was aware that Puente owned a gun, as Puente had previously tried to sell the gun to him. Koss told Puente that his cousin was interested in the gun and suggested that they drive to the South Side to attempt to sell the gun. Puente loaded the gun, since "nobody was going to buy [a gun] if they don't know it works." *Id*. at 463.[3] Puente drove Koss to the cousin's home, where he drank three additional beers but was unable to sell the gun.

At 8:15 p.m., Puente and Koss drove to the El Saloon after Koss asked Puente where they could purchase cocaine. In an affidavit attached to his state post-conviction petition, Puente stated that he suggested to Koss that they should get drugs. During the evidentiary hearing, however, he denied that he made this suggestion. The men arrived at the El Saloon at approximately 8:30 to 9:00 p.m. At this point, the gun was in the pocket of Puente's shorts.

The El Saloon was on the first floor of a two-story building. The doorway to the El Saloon had a single step that was about 8 inches above the level of the sidewalk, and the establishment itself had a bar jukebox, pool tables, a dancing area, and restrooms at the back. On the night of the shooting, there were between thirty-five and forty-five people at the El Saloon. Puente recognized Jose Montejano (the bartender), purchased a quarter of a gram of cocaine from Montejano, and did lines of cocaine in the bathroom with Koss. Puente also

---

[3] As noted by the respondent, on cross-examination Puente acknowledged that when he bought the gun, it never crossed his mind to test fire it. Fed. Tr. at 464.

recognized a female bartender, frequent patron Jesus Avila, and David Saragosa, who lived above the El Saloon.

After Puente and Koss emerged from the bathroom, a bar patron began to mock Koss. Puente and Avila attempted to defuse the situation. Three other bar patrons voiced their support of the man mocking Koss. One of the three men, who was over 6 feet tall and weighed 200 to 225 pounds, shoved Puente, who is approximately 5 feet, 5 inches, with his hands, dared Puente repeatedly to fight, stated, "you mother fuckers, if you want to fight, I'm willing to fight with any of the three of you [Puente, Koss, or Avila]," and told Puente he could "beat the shit out of [him]." *Id*. at 332-33. Puente repeatedly declined to fight and again told the man to calm down.

Puente complained to Montejano and Montejano's brother, who was also tending bar at the El Saloon. Montejano instructed his brother to speak to the man and told Puente that his brother would be responsible for cocaine sales for the rest of the evening. Puente purchased another quarter of a gram of cocaine. At about 10:00 p.m., Avila left the El Saloon. Puente and Koss stayed and continued to drink beer and snort cocaine.

Two people entered the El Saloon selling electric table fans. Puente purchased a set of fans, and Puente and Koss carried them to the front of the El Saloon. As they did so, the large man who had been threatening Puente told him he should leave or "he was going to kick [Puente's] ass." *Id*. at 341. Koss exited the El Saloon with the fans. Puente ordered two more beers, and the large man continued to threaten him.

Puente believed the man was going to hit him. Thus, he drew his loaded gun, intending to scare the man and his friends. The man and his companions dropped to the floor. Puente testified that he did not intend to kill anyone and that if he had wanted to do so, he could have as

the aggressors were directly in front of him. Puente knew that if he shot anyone, "there would be serious consequences." *Id*. at 344-45. As he heard glass breaking behind him, he spun around, thinking "somebody could hit me from behind." *Id*. at 345. He felt a blow to the back of his legs (that turned out to be caused by a barstool). His feet moved forward in his flip-flop style sandals, his arm flew upwards, and the gun discharged towards the ceiling. Despite stating the contrary at his deposition in this case, Puente Dep. at 54-55, Puente testified that his finger was never on the trigger, Fed. Tr. at 350, 476 ("My finger was inside where the trigger is, but it wasn't on the trigger."). Despite stating the contrary in his § 2254 petition, Puente denied that he argued with the victim, and characterized Rodriguez as an "innocent bystander." Fed. Tr. at 477-78. After his gun discharged, Puente did not believe anyone had been shot.

Montejano, his brother, and four to five others ran towards Puente as they threw bottles, glasses, and cans at him. The men who had threatened Puente were on the floor behind him. Puente started backing towards the door and refused to give the gun to Montejano, who asked for it. He forgot that the entrance to the El Saloon had a step and tripped for a second time that evening. As he fell backwards, the gun discharged a second time "towards the sky." *Id*. at 354. Koss arrived in Puente's car, yelling "Let's go." *Id*. at 356, 485-86. They drove off, and Puente told Koss to stop "driving like a maniac." *Id*. at 356. Puente told Koss that "nothing happened" but also stated he had been hit with a chair and had discharged his gun towards the ceiling. *Id*.

Ultimately, Puente consumed a total of four or five lines of cocaine and twelve or thirteen beers that evening. He had all of the cocaine and seven of the beers at the El Saloon. He went home, did not contact the police, and did not tell his wife what had happened. The following week, he used a blowtorch at work to destroy the gun.

### c. Puente's Arrest

A few weeks after the shooting, the police – including Detective Perez, who spoke fluent Spanish – came to Puente's place of employment. The police asked Puente questions about the shooting in English even though Puente asked them to speak in Spanish. Puente was asked if he regularly went to El Saloon and answered, "once in a while." *Id*. at 496. He also confirmed that he had purchased two electric fans while at the El Saloon. After Puente was taken to the police station, an "American" person, speaking English, told Puente he was being "charged with a death." *Id*. at 497. At this time, Puente realized someone had been fatally shot at the El Saloon.

### d. Puente's Representation by Attorney Raul Villalobos

Puente's wife called attorney Raul Villalobos, who contacted Puente three to four days after his arrest. Puente told Villalobos he was being charged with a death, but it was based on an accident. When Villalobos and his associate, Jesus Perez, visited Puente at the Cook County Jail to discuss the case, Puente repeated that the shooting was an accident that happened after someone at the bar threatened him.

Perez represented Puente at a suppression hearing regarding Puente's statements to the police after his arrest. At the suppression hearing, Puente testified that the shooting was an accident. The court denied the motion to suppress. Following the hearing, Villalobos discussed a plea with Puente. Puente refused to give Villalobos permission to discuss a plea, and said he wanted to go to trial and testify about what had happened at the El Saloon. Puente returned to the Cook County Jail and decided to fire Villalobos. However, he testified that he did not believe that Villalobos was ineffective. He also testified that any allegation of ineffective

assistance against Villalobos in his state collateral proceedings was "a mistake" by the person drafting the pleadings. *Id*. at 504.

### e. Puente's Representation by Attorney James Marcus

After firing Villalobos, Puente hired attorney James Marcus based on a recommendation by Victor Medina, another detainee at the Cook County Jail. Puente and Marcus met several times at the Cook County Jail with Medina acting as interpreter. Marcus told Puente to write out everything that happened. Marcus told Puente he would not call Puente to testify at trial because Puente was "nervous" and "the State was going to eat [him] up." *Id*. at 399. Marcus also told Puente he had a "surprise" for the State but did not tell Puente what that was. *Id*.

Pursuant to Marcus's instructions, Puente prepared a summary of the facts with the assistance of Emilio, another inmate. Emilio wrote Puente's statement in English, and Puente ensured that the translations were accurate by discussing the facts and instructing Emilio to read the statement back to him. Puente does not have the statement and did not make a copy of it before giving it to Marcus. Marcus did not retain Puente's file, so was unable to produce the file in response to a discovery request made in this case.

Marcus did not provide Puente with the State's discovery or discuss the charges, trial strategy, potential defenses, or potential penalties with Puente prior to trial. Puente denied telling Marcus that he was not at the El Saloon on the night of the shooting. Puente believes that Marcus should have pursued an "accident" defense and contends he would have rejected any suggestion that he use a misidentification defense. *Id*. at 492. At the evidentiary hearing, he testified both that if possible, he would have pled to a lesser crime, *id*. at 455, *and* that he did not want to discuss a plea bargain, *id*. at 523.

During trial, the judge did not advise Puente that he had the right to testify on his own behalf, and he did not testify. Puente was surprised that Marcus did not call any witnesses to testify. Puente did not recall Marcus's closing argument. Puente explained this was because "[a] long time has gone by, and [he is] ignorant of the laws." *Id*. at 528. The jury found Puente guilty of first-degree murder.

### 2. Raul Villalobos's Testimony

During 1995 to 1996, Raul Villalobos was a licensed attorney in Illinois who practiced mostly criminal law. He had previously served 4 to 5 years as an Assistant Cook County State's Attorney, where he was assigned to murder and rape cases and tried at least 50 murder cases. He was responsible for supervising and training other attorneys. When he left the office, Villalobos practiced in several law firms before forming his own firm in the 1990s. By the time Villalobos met Puente, he had tried 50 to 60 murder cases, most of which involved shootings. He had also tried death penalty cases.

Puente's family retained Villalobos because they knew his associate, Jesus Perez. Villalobos believed that his first contact with Puente occurred prior to Puente's arrest, when Puente called to say he had accidentally shot someone in a bar. Because Puente said that police were looking for him, Villalobos was sure that he told Puente that he was likely to be arrested and that Puente should turn himself in, accompanied by a lawyer.

Villalobos visited Puente at the Cook County Jail but did not remember when. He generally recalled that Puente told him he had discharged his gun into the ceiling of the El Saloon while trying to defend himself during a melee where bottles and bar stools were being thrown, and that Puente had fired a second shot after he fell back. According to Villalobos, to be

eligible for an instruction for involuntary manslaughter, he would have had to concede that Puente had fired a gun, and that Puente's actions were reckless or in self-defense.  Villalobos told Puente he "had a good – a pretty good defense, either self-defense, since one of the waitresses that I personally talked to said that they were throwing chairs and bottles at [Puente] as he was backing out of the bar." *Id*. at 275.  Villalobos thought Puente could also argue accident, because Puente "said he fell back . . . . Either of those two defenses I believed was pretty effective in this case.  Would be." *Id*.  He anticipated calling Puente at trial because he needed to do so to support a self-defense theory.  Villalobos did not consider a misidentification defense since several witnesses at the bar knew Puente.

Villalobos did not ask Puente if he was a United States citizen.  He did not recall discussing whether Puente would testify.  He did not have the opportunity to "formally" discuss defenses with Puente but did briefly raise this issue with Puente before being fired.  Villalobos did not remember whether he discussed the State's discovery with Puente.

Villalobos's firm handled Puente's suppression hearing.  Perez represented Puente. Despite the denial of the motion to suppress, Villalobos believed that the suppression hearing would help Puente because his testimony at the hearing to the effect that the shooting was an accident would be consistent with his anticipated trial testimony.  Nevertheless, Puente fired Villalobos after the motion to suppress was denied.  Villalobos did not recall how he was fired but assumed it happened because of the adverse ruling on the motion to suppress.

After he was fired, Villalobos briefly met with Marcus.  Villalobos told Marcus that Marcus should send his investigator to talk to the bartender.  He could not remember what Marcus said to him, and he had no more involvement in the case following the meeting.

### 3. James Marcus's Testimony

Attorney James Marcus was admitted to practice law in 1970 and has tried hundreds of matters, including murder and involuntary manslaughter cases. He had worked at the Justice Department, and argued before the United States Supreme Court on behalf of a criminal defendant. At the time of Puente's trial, seventy percent of Marcus's practice was dedicated to criminal defense.

Puente retained Marcus after Puente became dissatisfied with Villalobos. Marcus recalled that during his first meeting with Puente, Puente told him that his prior attorney wanted him to plead guilty but that he "was insistent on this case being tried, and [that] he was innocent" of murder. *Id.* at 128. Marcus testified that it was his practice, when representing Spanish-speaking defendants, to use an interpreter employed by his office. Marcus never used prisoners to interpret because doing so would violate the attorney-client privilege. He also testified that he could not have used an inmate to interpret because the Cook County Jail (where Marcus met Puente) allowed attorneys to visit only one prisoner at a time. Marcus denied that he used Medina to interpret at any of his meetings with Puente.

Marcus received the State's discovery from Villalobos. He also testified that he received a copy of the transcript from the suppression hearing, during which Puente stated that he had a gun on the night of the shooting. Before trial, Marcus was aware that Montejano knew Puente by his first name (Raul), had told police that Puente had fired a gun inside the El Saloon on the night of the murder and left the El Saloon in a maroon car, and had identified Puente in a police photo array. Ultimately, however, Montejano was unable to make an in-court identification of Puente at trial.

Marcus was also aware that Cuahemoc Murillo, who was at the El Saloon on the night of the shooting, heard shots, saw a person outside the bar holding a gun and heard that person say he had just shot someone, and saw the person depart in a maroon car with the license plate number MGP 75. Puente met Murillo for the first time on the night of the shooting. Puente Dep. at 31. Marcus knew that the license plate number on Puente's car was WGP 759. Prior to trial, Murillo said that Puente was one of two people in a four-person lineup who was the shooter. Murillo, too, ultimately did not make an in-court identification.

In addition, Marcus was aware that Juan Morales told police he saw Puente fire a gun at the El Saloon on the night of the murder. As with Murillo, Puente met Morales for the first time on the night of the shooting. Puente Dep. at 32. Morales selected Puente from a line-up as the shooter. At trial, Morales testified that he stopped by the El Saloon for a beer after work, people started throwing chairs, and then a man entered the bar holding a gun. According to Morales, he saw Puente in the bar with the gun in his hand, and there were approximately 15 people between him and Puente. Although Morales has cataracts and wears glasses, he was not wearing his glasses on the evening of the shooting.

Moreover, Marcus was aware that David Saragosa, who lived above the El Saloon, was acquainted with "Raul," who lived in Cicero, and had a photograph from the baptism of one of Raul's children. Puente lived in Cicero, and church records showed that the "Raul" from the baptism was Raul Puente.

It was Marcus's custom and practice to explore the possibility of plea deals. He specifically recalled discussing a plea with Puente because it was "very rare" that his clients refused to allow him to enter into plea discussions. Fed. Tr. at 89. Marcus testified that he did

not explicitly tell Puente that he was making a mistake by going to trial.  *Id*. at 169 ("I told him it

was a mistake – I said – well, not exactly.  What I told him was let me try to talk to the State

about resolving the case by way of plea.  I never was given that opportunity.").  Marcus felt he

had no choice but to proceed to trial on the first-degree murder charge since Puente would not

allow him to engage in plea negotiations and took the position that "[h]e didn't shoot anybody.

He wasn't there, and he didn't shoot anybody."  *Id*. at 173; *see also id*. at 174-75 ("I could have

put on an involuntary manslaughter defense, except my client is telling me he didn't do it.  So

what was I going to put on? . . . . He maintained his innocence throughout.  I can't ask him to

plead – I would be sitting here on another petition.  I couldn't ask him to plead guilty to

something he didn't do.").

     It was also Marcus's custom and practice to review all records, reports, and witness

statements with a defendant prior to trial, which is why he went to the jail to see Puente.  Illinois

Supreme Court Rules at the time prevented Marcus from giving Puente a set of the discovery

documents.

     Marcus ordinarily reviewed the possible penalties and potential defenses with a

defendant prior to trial.  Marcus recollected that he discussed involuntary manslaughter with

Puente but, based on Puente's denial that he was involved in the shooting, believed that this was

not a viable defense because Puente would not acknowledge that he shot Rodriguez.  He also

recalled discussing Puente's testimony at the suppression hearing, but stated that Puente "never

explained . . . why he testified that way" and added that he "believe[d] it's in there also that he

testified he

never shot anybody."  *Id*. at 135.

In preparing for trial, Marcus took an investigator to the El Saloon. "[T]he lighting wasn't particularly good" and the bar offered dancing, darts, and a pool table. *Id*. at 111. Marcus also talked to Puente's wife and family and had his investigator talk to the State's witnesses. He decided to pursue a misidentification defense based on Puente's position that he did not shoot Rodriguez. *Id*. at 142.

### 4. Victor Medina's Stipulation

The parties stipulated that, if called to testify during the federal evidentiary hearing, Victor Medina would have testified to certain evidence, but did not stipulate to the truth of that evidence. *See* Dkt. 148 (Medina Stipulation). Victor Medina and Puente are both incarcerated at the Dixon Correctional Center. Medina is serving a 40-year sentence for a 1996 armed robbery conviction and previously served an 8-year sentence for delivering more than fifteen ounces of cocaine. Medina has used the names "Daniel Aponte" and "Victor Morales."

Spanish is Medina's native language, and he has great difficulty communicating in English. He used an interpreter for the two trials associated with his state criminal convictions. Marcus represented Medina at his 1996 trial. Medina was initially pleased with Marcus because he obtained an acquittal on a murder charge. However, Medina became unhappy when he was sentenced to forty years in prison.

In 1999, under the Aponte alias, Medina filed a state post-conviction petition challenging his armed robbery conviction. Medina's petition was written by another inmate as Medina was unable to write it himself. In the petition, he stated that he "does not read English or properly understand [it]," Medina Stip. at ¶¶ 31-32, and then repeated that he "does not speak English or write it," *id*. at ¶ 35.

According to Medina, he learned some English between 1992 and 1996. Medina met Puente at the Cook County Jail in 1995 before Medina was sentenced for the 1996 conviction and became dissatisfied with Marcus. Medina recommended Marcus because of the acquittal on the murder charge. Medina and Puente are not friends and were never housed together at Dixon or the Cook County Jail, but they respect each other.

Four to five months after Medina's trial, Marcus met twice with Puente at the Cook County Jail while Medina translated. Marcus did not employ Medina, and Medina was not a certified interpreter. At the time, Medina spoke "broken" English, while Puente knew only "a few words" in English. *Id*. at ¶ 18. According to Medina, Marcus stated that he had decided Puente would not testify, and that he had a "surprise" for the State. *Id*. at ¶ 24. Medina thought that Puente seemed depressed about the decision not to call him to the stand. Medina thus told Puente to trust Marcus because his decision not to have Puente testify might be for Puente's own good.

## II. STANDARD OF REVIEW

The sole issue before the court is whether Marcus provided constitutionally ineffective assistance of counsel when he pursued a mistaken identify defense at trial. To receive habeas relief on this claim, Puente must establish that Marcus's representation fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *See Strickland v. Washington*, 466 U.S. 668, 687-91 (1984). Under *Strickland*, the court's review of counsel's performance is "highly deferential," meaning that to prevail, Puente must "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy."

*Woolley v. Rednour*, 702 F.3d 411, 422-23 (7th Cir. 2012) (quoting *Strickland*, 466 U.S. at 689).

If Puente fails to satisfy the performance or prejudice prongs under *Strickland*, the court's

inquiry ends. *See Strickland*, 466 U.S. at 697.

### III.  DISCUSSION

The parties correctly agree that the resolution of Puente's § 2254 petition turns on the

credibility of the witnesses who testified at the evidentiary hearing and the light that their

testimony sheds on Marcus's decision to pursue a misidentification defense.  As the court noted

in its previous orders, the State's case was strong.  Detective Perez testified that Puente admitted

he fired a shot into the El Saloon.  El Saloon bartender Montejano recognized Puente as "Raul,"

told police that Puente had fired a gun at the El Saloon on the night of the murder and left the El

Saloon in a maroon car, and identified Puente in a police photo array prior to trial.   El Saloon

patron Murillo heard shots, saw a person outside the bar holding a gun and heard that person say

he had just shot someone, and saw the person depart in a maroon car with the license plate

number MGP 75, which was very close to Puente's license plate number (WGP 759).  Murillo

also said that Puente was one of two people in a four-person lineup who was the shooter. El

Saloon patron Morales saw Puente in the bar with the gun in his hand and selected Puente from a

line-up as the shooter.  Saragosa, who lived above the El Saloon, knew "Raul" who lived in

Cicero, and had a photograph from the baptism of one of Raul's children.  Puente lived in

Cicero, and church records demonstrated that the only "Raul" with a baptism that matched the

date provided by Saragosa was Raul Puente.

On the other hand, at trial, Murillo could not identify Puente, and Montejano neither

testified consistently with his statement identifying Puente as the shooter nor identified him.

Marcus brought out that Morales, the third eyewitness, had cataracts and was not wearing his glasses on the night of the shooting, and that the El Saloon was crowded and dimly lit on the evening of the shooting. He also questioned procedures used in line-ups where Puente was identified and the police's alleged questioning of Puente in English. *See* Trial Tr. F-51-73 (defense closing argument surveying the evidence).

This court's task, however, is not to second-guess the jury's verdict. It is to determine, based on evidence not before the state court given its rulings on Puente's state post-conviction filings, if habeas relief is warranted based on trial counsel's decision to proceed to trial with a misidentification defense. *See Mosley v. Hinsley*, No. 05 C 248, 2013 WL 1222128, at *1 (N.D. Ill. Mar. 25, 2013). Based on its careful study of the entire record and the four-day evidentiary hearing, the court simply cannot accept Puente's current version of events. In sum, the court finds that: (1) Puente's testimony was largely unconvincing in virtually all material respects; (b) his former attorneys (Villalobos and Marcus) were credible; (c) Medina was not credible; and (d) Puente's professed willingness to admit facts necessary to support an involuntary manslaughter defense (either accident or self-defense) arose only after he was convicted of first-degree murder.

### A.     Puente's Credibility

At the evidentiary hearing, Puente's memory was generally excellent on direct examination, and his answers to questions were largely responsive. For example, he was able to describe his prior brushes with the law despite the passage of time, including the different names he used for various arrests. He testified regarding the rationale for his after-work clothing choices – including shorts and flip flop-style sandals – on the day of the shooting. He described the exterior of the building housing the El Saloon in detail (two stories; brick; a small window in

front with a beer ad; a wooden front door leading to the El Saloon and a separate door leading upstairs; an 8-inch step from street level into the El Saloon; and houses to the side that were set back further than the El Saloon building).

Similarly, he provided an exhaustive description of his purchase of fans at the El Saloon: the fans were a table-style model; they were electric; they were in boxes that were 16" x 16"; the boxes had a "picture of a fan standing in a sort of living room, and air was kind of going around"; the fans were portable, but had an optional piece that could be attached to adjust the height; and he needed the fans for his daughters as his home was not air-conditioned. The individuals selling the fans approached him and offered to sell a set of fans for $45. Puente unsuccessfully attempted to negotiate a lower price. The sellers walked deeper into the El Saloon and offered to sell the fans to other patrons, but Puente did not see anyone make a purchase. The sellers returned to Puente on their way out and accepted his offer to purchase two fans for $35. Puente bought the fans and placed them on the floor of the bar next to his barstool. He remained there, guarding the fans, while Koss went to ingest more cocaine in the bathroom. Koss returned with the cocaine, as the restrooms were occupied, and asked Puente to borrow the keys to Puente's car so he could use the cocaine there. Puente gave the keys to Koss, thinking Koss could place the two fans in the car. Koss and Puente walked to the exit, each holding a boxed fan. When they reached the door, Puente handed his fan to Koss, and Koss headed to the car with both fans. Fed. Tr. at 337-41.

In contrast, Puente's testimony at the evidentiary hearing about facts relating to the substance of his claim of ineffective assistance of counsel was laden with inconsistencies. First, he agreed that his recollection of the shooting and the events leading up to it, as recounted at the

evidentiary hearing, was "perfectly clear" as he would "have this in [his] mind for the rest of [his] life." *Id.* at 462. Nevertheless, he testified that he ingested four or five lines of cocaine and twelve or thirteen beers on the evening of the shooting. Prior to the federal evidentiary hearing, he characterized his drug and alcohol consumption as "excessive," Pet. at 6, and consistently contended that the beers and cocaine clouded his mental abilities on the evening of the shooting. *See* Puente Aff. in Support of State Post-Conviction Pet. (after his gun discharged twice, "if I was in the right state of mind I would have acknowledged something was wrong. In fact, I never knew that I shot anybody until I was arrested."); Resp. Ex. M at 14 (state post-conviction petition for leave to appeal) (Puente fled from the El Saloon after the gun went off because he "had sniffed cocaine and had a good deal to drink" so "was not in his right mind"); Resp. Ex. G at 22 (Puente's response to post-conviction appellate counsel's motion to withdraw) (since Puente "consumed alcohol and cocaine" at the El Saloon, trial counsel's "failure . . . to present evidence of [his] alcohol and drugged condition at the time of the crime fell below an objective standard of reasonableness due to a licensed attorney [sic] because it is clear that both substances had a profound affect upon petitioner-appellant's 'mea rea' [sic] and his capacity to rationalize his conduct, or be aware of his act, nor understand his intent . . . ").

When asked about the tension between his allegedly clear memory during the federal evidentiary hearing and his prior statements in state and federal court about the effect of alcohol and cocaine, Puente stated, "I was drinking, I was inhaling cocaine, but I was not mentally retarded." Fed. Tr. at 530. Next, he admitted that if he "had been 100 percent certain about what had happened, I wouldn't want to – well, I would not be here." *Id*. at 531. He then attempted to

reconcile his federal testimony with his prior filings by cryptically stating, "The mind has nothing to do with one's sight." *Id*.

Second, in the state court proceedings, Puente stated that he wanted to purchase cocaine on the night of the shooting. *See* Puente Aff. in Support of State Post-Conviction Pet. at 2 ("I then remembered that a gentlemen at the bar where I usually drank wanted to buy my gun. The bar was called "El Salon" [sic]. I then told my neighbor [Koss] let's go have a drink. All this time I was drinking with him I also wanted to get some cocaine and he agreed."). In contrast, during the federal evidentiary hearing, he twice blamed Koss for the decision to purchase cocaine. *Id*. at 230, 464-65.

Third, Puente's testimony regarding whether his finger was on the trigger of the gun was inconsistent. Puente testified that when both shots were fired, his finger was on the trigger. *Id*. at 476 (summarizing Puente's deposition testimony); Puente Dep. at 54-55 (Puente's finger was "[on] the trigger" when the first shot was fired and was "[a]lso on the trigger" for the second shot). He also implausibly testified that his finger "wasn't on the trigger, but it was inside that – that loop, that loop that the trigger sits in." Fed. Tr. at 349; *see also id*. at 575 ("My finger was inside where the trigger is, but it wasn't on the trigger"). Given that a gun's trigger sits inside a loop (the trigger guard), the court doubts this is possible, especially since Puente contends he was brandishing the gun (purportedly with his finger inside the trigger guard but not on the trigger) after consuming large amounts of cocaine and alcohol. Finally, Puente testified that he told Villalobos he had a gun but denied that he ever said his finger was on the trigger. *Id*. at 503.

Fourth, in his state court post-conviction petition, Puente took the position that Rodriguez, the victim, was the aggressor. Specifically, Puente contended that trial counsel

(presumably, Marcus) should have called Koss to testify at trial. According to Puente, Koss would have testified he and Puente were "drinking and sniffing cocaine all the time they were in the tavern" and that they were "being harassed from [sic] the victim (ROGELIO RODRIGUEZ) and his friends." Resp. Ex. D at 4 (state post-conviction petition). In contrast, during the evidentiary hearing, Puente contended he never argued with Rodriguez, and also said that Rodriguez was an "innocent bystander" who had not insulted him or Koss. Fed. Tr. at 477-78. He then attempted to explain this inconsistency by stating that he "[did not] remember well," "would need to see the paperwork" as he "did not remember," and that someone prepared his state post-conviction petition for him and must have made an error. *Id*. at 479-81. The court could point out additional inconsistencies, but doing so would not be fruitful. In short, Puente simply was not credible, either in his manner on the stand or in the substance of his testimony.

## B.    Victor Medina

The parties filed a stipulation summarizing what Medina would say if called to testify, but did not stipulate to the truth of that testimony. *See* Dkt. 148 (Medina Stipulation). The court did not personally observe Medina. Nevertheless, the court believes that Medina told Puente that Marcus had obtained an acquittal on a murder charge and that Puente retained Marcus based on this recommendation. However, the court rejects the rest of Medina's putative testimony. Both before and after Puente's trial, Medina required a translator in connection with his own legal proceedings. Given Medina's lack of fluency in English, he could not have acted as Marcus and Puente's interpreter. This is especially true given that Medina's testimony was premised on his alleged meetings with Marcus and Puente at the Cook County Jail to act as

translator but, as discussed below, the evidence is strong that these three-way meetings could never have occurred.

**C.    Puente's Attorneys**

The court finds that both Villalobos and Marcus were credible.  Unlike in his state court proceedings, Puente does not assert that Villalobos provided ineffective assistance of counsel, so the court will not assess Villalobos's actions through the lens of *Strickland*.  Villalobos's testimony, however, is important, as it sheds light on Puente's motivation in firing Villalobos and retaining Marcus.  This point is critical, as this decision was the first step in the chain of events that led to Puente's trial for first degree murder based on a misidentification defense, with no attempts to negotiate a plea.

The court finds that Villalobos was proceeding with initial pre-trial matters (with the assistance of his associate, Jesus Perez) when Puente fired him because: (1) Puente was dissatisfied with the fact that Perez (not Villalobos) represented him during the suppression hearing; (2) Puente was unhappy with the trial court's denial of his motion to suppress his statement to the police; (3) Puente was deeply upset with Villalobos's willingness to engage in plea discussions; (4) Puente wanted to retain Marcus based on Medina's representation that Marcus had obtained an acquittal on a murder charge against Medina; and (5) Puente was aware that a conviction would lead to deportation.

With respect to Marcus, based on Marcus's testimony about his preparation for trial, the court rejects Puente's claim that Marcus did not review the expected evidence or discuss the right to testify or any potential defense theories with Puente.  Similarly, it cannot accept that Marcus, an experienced criminal defense attorney, used Medina as an interpreter at the Cook

County Jail instead of one of his own employees and thus intentionally waived attorney-client privilege. This is especially true given Medina's self-professed inability to speak fluent English at the relevant time, the fact that Medina needed a Spanish-English translator himself at his 1996 trial, and his alleged sudden fluency when he purportedly translated for Puente and Marcus in this same time period.

With respect to Marcus's performance, "*Strickland* establishes a deferential presumption that strategic judgments made by defense counsel are reasonable." *Mosley v. Atchison*, 689 F.3d 838, 848 (7th Cir. 2012). Moreover, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689.

As the respondent notes, under Illinois law, involuntary manslaughter is defined as the killing of another by actions that "are such as are likely to cause death or great bodily harm" and are "perform[ed] recklessly." 720 Ill. Comp. Stat. § 5/9-3(a). Under Illinois law, a person acts recklessly when he "consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow . . . and that disregard constitutes a gross deviation from the standard of care that a reasonable person would exercise in the situation." 720 Ill. Comp. Stat. § 5/4-6. Based on this court's findings of fact from the evidentiary hearing, it concludes that Marcus could not argue that Puente shot the victim at the El Saloon due to a conscious disregard of a risk given Puente's position that he was not present at the El Saloon at all. This left Marcus with one option – misidentification – which the state court trial record shows that he vigorously pursued.

Puente was entitled "to make major decisions about his defense." *See Wallace v. Davis*, 362 F.3d 914, 920 (7th Cir. 2004) (citing *See Godinez v. Moran*, 509 U.S. 389 (1993)). This is because "the constitutional right is to legal assistance; 'assistance' differs from an entitlement (let alone an obligation) to override a client's instructions." *Id.* (citing *Faretta v. California*, 422 U.S. 806 (1975)). Thus, while "[m]any decisions during trial fall to counsel by default or by virtue of superior knowledge," critical decisions "such as whether to testify or present a defense . . . may be exercised personally, if the accused wants to make rather than delegate these vital choices." *Id.*

Puente was, therefore, entitled to make important decisions, such as whether to testify and whether to proceed with an involuntary manslaughter defense. The court finds that he did so after consulting with Marcus. Marcus was unable, given the passage of time, to recall the exact words he used when preparing Puente for trial. *See* Fed. Tr. at 72 ("I know we talked about the case, we talked about the evidence, we talked about the discovery, we talked about his potential testimony, we talked about, you know, the – how the case was going. I had to explain to him how the case was going to proceed. But can I recall specifically on the second meeting I told him A, B, C – no, I cannot.").

In contrast, Marcus specifically recalled discussing potential defenses with Puente, given Puente's "adamant" position that "he wasn't there, and he didn't do this, he did not shoot anybody." *Id.* at 87. This position, obviously, had a major impact on Marcus's trial strategy. Puente's position put Marcus between the proverbial rock and a hard place. Critically, Marcus did not explicitly tell Puente that he was making a mistake by going to trial. Instead, he tried to talk Puente into allowing him to negotiate a plea. *Id.* at 169 ("I told him it was a mistake – I said

– well, not exactly. What I told him was let me try to talk to the State about resolving the case by way of plea. I never was given that opportunity."). Puente, however, would not allow Marcus to engage in plea negotiations and maintained that "[h]e didn't shoot anybody. He wasn't there, and he didn't shoot anybody." *Id*. at 173.

Given the facts of this case, does Marcus's failure to tell Puente, clearly and unmistakably, that Marcus thought Puente was making a mistake rise to the level of ineffective assistance of counsel? Certainly, Marcus could have more vigorously tried to talk Puente out of his decision to refuse to allow plea negotiations and his decision to proceed to trial while denying that he was at the El Saloon on the night of the murder. Yet, as Marcus correctly recognized, given Puente's desire to go to trial to attempt to obtain a complete acquittal on the first-degree murder charge (similar to the result Marcus obtained for Medina, which caused Puente to retain Marcus), "what was I going to put on? . . . . [Puente] maintained his innocence throughout. I can't ask him to plead – I would be sitting here on another petition. I couldn't ask him to plead guilty to something he didn't do."). *Id*. at 174-75.

This conclusion is supported by the Supreme Court's recent decision in *Burt v. Titlow*, __ S.Ct. __, No. 12-414, 2013 WL 5904117 (Nov. 5, 2013). In that case, the defendant fired his attorney, who had negotiated a plea agreement where the defendant would plead guilty to manslaughter. The defendant retained substitute counsel, proclaimed his innocence, withdrew the plea, and went to trial. After the defendant was convicted of second-degree murder, he sought habeas relief based on replacement counsel's allegedly inadequate advice about the withdrawal of the guilty plea. The Court acknowledged that although "a defendant's proclamation of innocence does not relieve counsel of his normal responsibilities under

*Strickland*, it may affect the advice counsel gives."  *Id*. at *6.  It then found that replacement

counsel's performance was constitutionally adequate because the defendant did not identify

evidence demonstrating that counsel failed to provide material advice or gave incorrect advice

based on the claim of innocence.  *Id*. at *6-7.

 As discussed above, the court finds that Puente told Marcus that he was innocent.  Given

this position, Puente cannot prevail on his ineffective assistance of counsel claim because

he cannot show that Marcus did not provide material advice or erred when he offered a

misidentification theory at trial.  *See id*. at *7 ("It should go without saying that the absence of

evidence cannot overcome the 'strong presumption that counsel's conduct [fell] within the wide

range of reasonable professional assistance.'") (quoting *Strickland*, 466 U.S. at 689).

 In sum, following the guilty verdict, Puente professed a newfound willingness to admit

that he was at the El Saloon on June 17, 1995, armed with a gun that he discharged twice.  The

court finds that Puente's version of events changed because his strategy of denying that he was at

the El Saloon on the night of the murder and refusing to negotiate a plea based on his assertions

of innocence backfired given the guilty verdict.  Section 2254 does not allow Puente to obtain a

new trial by denying that Marcus (and Villalobos) discussed defenses and the possibility of

negotiating a plea with him and casting sole responsibility for the decision to rely on

misidentification on Marcus.  *See Wallace*, 362 F.3d at 920 (explaining that a good lawyer tries

to persuade his client to make a wise decision, but the client ultimately has the power to make a

final decision).

 The court also notes that "[c]ounsel's actions are usually based, quite properly, on

informed strategic choices made by the defendant and on information supplied by the

defendant." *Strickland*, 466 U.S. at 691. Thus, an attorney is entitled to rely on factual information provided by his client and make strategic decisions based on that information. *Zarter v. Dittman*, No. 12-CV-1189, 2013 WL 3924354, at *4 (E.D. Wis. July 29, 2013). Counsel's strategic decisions made based on client information are not ineffective assistance of counsel if they are reasonable in light of what the client said. *Id*. (citing *Strickland*, 466 U.S. at 691).

Given this court's findings about what Puente told Marcus, a misidentification defense was the only viable option at trial. Thus, choosing this defense was eminently reasonable. This strategy required Marcus to attempt to discredit Puente's alleged confession and the State's witnesses during trial, but not concede that Puente fired the gun. Marcus could not have simultaneously denied that Puente fired the gun *and* argued that he did so by accident or in self-defense.

Moreover, the record contradicts Puente's current position that he would have engaged in plea negotiations and admitted he shot the gun had Marcus brought these subjects up with him. Villalobos advised Puente to engage in plea negotiations and brought up the concept of a self-defense or accident defense theory with Puente based on the version of events in Puente's alleged statement to the police. Puente did not accept Villalobos's advice. Instead, he fired Villalobos and started over with Marcus.

The court thus concludes that Marcus's decision to accept his client's version of the facts (which was consistent with Puente's sworn testimony during the state court hearing addressing Puente's motion to suppress), try to convince Puente to plead, and then proceed to trial based on the facts provided by his client satisfies the performance prong of *Strickland*. Because counsel

satisfied the performance of *Strickland*, the court need not reach the prejudice prong. *See Strickland*, 466 U.S. at 697.

## IV.  CERTIFICATE OF APPEALABILITY

Pursuant to Rule 11(a) of the Rules Governing § 2254 Cases, which provides that the district court must issue or deny a certificate of appealability when it enters "a final order adverse to the applicant," the court turns to whether a certificate of appealability should issue. Under 28 U.S.C. § 2253(c)(2), "(1) [a] certificate of appealability may be issued only if the prisoner has at least one substantial constitutional question for appeal; (2) [t]he certificate must identify each substantial constitutional question; (3) [i]f there is a substantial constitutional issue, and an antecedent non-constitutional issue independently is substantial, then the certificate may include that issue as well; (4) [a]ny substantial non-constitutional issue must be identified specifically in the certificate; [and] (5) [i]f success on a non-constitutional issue is essential (compliance with the statute of limitations is a good example), and there is no substantial argument that the district judge erred in resolving the non-constitutional question, then no certificate of appealability should issue even if the constitutional question standing alone would have justified an appeal." *Davis v. Borgen*, 349 F.3d 1027, 1029 (7th Cir. 2003).

The resolution of Puente's § 2254 petition turns on issues of credibility, not on questions of constitutional law.  For this reason, the court finds that Puente has not made a substantial showing of the denial of a constitutional right because he has not demonstrated "that reasonable jurists could debate whether the challenges in his habeas petition should have been resolved differently or that his petition adequately shows a sufficient chance of the denial of a constitutional right that he deserves encouragement to proceed further." *Rutledge v. United*

*States*, 230 F.3d 1041, 1047 (7th Cir. 2000).   Accordingly, the court declines to issue a certificate of appealability.

## V.  CONCLUSION

For the above reasons, Raul Puente's request for a writ of habeas corpus under 28 U.S.C. § 2254 is denied.  The court declines to certify any issues for appeal under 28 U.S.C. § 2253(c). The clerk is directed to enter a Rule 58 judgment terminating this case.  The court also acknowledges the significant amount of time that Puente's counsel, Roger Dusberger, has spent on this case since he was appointed in August of 2005, and thanks him for his service to his client and the court.


ENTER:


_____/s/_____
JOAN B. GOTTSCHALL
United States District Judge

DATED:   November 8, 2013